{¶ 1} Appellant Akeem Huggins appeals his conviction and sentence for involuntary manslaughter and aggravated robbery. Huggins assigns six errors for our review.[1]
 {¶ 2} Having reviewed the record and pertinent law, we affirm Huggins' conviction, but we vacate his sentence and remand for resentencing in light of State v. Foster[2] The apposite facts follow.
 {¶ 3} On the morning of August 3, 2004, four men ambushed William Singleton, the proprietor of the United Check Cashing store, as he arrived for work. In the ensuing struggle, one of the assailants shot Singleton in the chest, but before Singleton fell, he returned fire and shot the assailant in the head. Both Singleton and the assailant subsequently died at Huron Road Hospital.
 {¶ 4} In the initial investigation following the shooting, the Cleveland police department identified Arnold Shorter and Anthony Garrett as suspects, along with the deceased assailant, Ryhan Ikner. The investigation also indicated that the fourth assailant was a light complexion black male who was approximately six feet tall and weighed about 240 pounds.
 {¶ 5} In June 2005, pursuant to a plea agreement with the State of Ohio, both Shorter and Garrett entered guilty pleas to involuntary manslaughter. In addition, *Page 4 
Shorter and Garrett agreed to cooperate with the State by identifying the fourth assailant. Both Shorter and Garrett made written statements wherein they identified Huggins as the fourth participant in the robbery which led to the double homicide. Both codefendants agreed to testify at trial.
 Jury Trial {¶ 6} At the trial, which commenced on February 13, 2006, Garrett testified that, pursuant to a plea bargain with the State, he pled guilty to involuntary manslaughter and aggravated robbery, and was sentenced to a prison term of fifteen years. Garrett also testified that, pursuant to the plea bargain, he was required to testify about the robbery, which led to the deaths of Singleton and Ikner. However, after answering some preliminary questions, Garrett asserted his Fifth Amendment privilege and refused to testify further.
 {¶ 7} Shorter testified that, pursuant to a plea agreement with the State, he also pled guilty to involuntary manslaughter and aggravated robbery, and was sentenced to a prison term of twenty-two years. Shorter stated that after he commenced serving his sentence, he discovered that Huggins' brother, Dermayne, had made a statement which led to Shorter's being indicted. Shorter stated that it was this discovery which prompted him to identify Huggins as the fourth assailant. Shorter stated that he agreed to testify against Huggins. In return, the State agreed to reduce Shorter's original prison term from twenty-two years to thirteen years. *Page 5 
 {¶ 8} Shorter testified that he was involved in the planning and execution of the robbery. According to Shorter, the night before the botched robbery, he, Garrett, and Ikner stayed overnight at Huggins' home. Early the next morning, Huggins drove Shorter, Garrett, and Ikner to the check cashing store. Huggins and Ikner waited at the side of the building for Singleton to arrive, while Shorter and Garrett acted as lookouts from a location across the street.
 {¶ 9} When Singleton arrived and exited his vehicle, Ikner approached from the side of the building with his gun drawn. Ikner shot Singleton, who returned fire, hitting Ikner in the head. Shorter ran from his lookout location to the parking lot and retrieved Ikner's gun and cell phone. Shorter unsuccessfully tried to reach the other codefendants on their cell phones. Shorter then made his way over to Huggins' van and found Huggins sitting in the van. Shorter dropped the gun in the van and returned to the crime scene to check on Ikner's condition.
 {¶ 10} On March 3, 2006, at the conclusion of the trial, the jury returned guilty verdicts on two counts of involuntary manslaughter and two counts of aggravated robbery. On March 23, 2006, the trial court sentenced Huggins to a total prison term of fifteen years.
 Putative Defendant {¶ 11} We will address Huggins' first and second assigned errors together because central to both is the trial court's denial of Huggins' motion to suppress his *Page 6 
grand jury testimony. Huggins specifically argues that he was a putative defendant when he was subpoenaed before the grand jury and should have been advised of his Fifth Amendment right and should have been givenMiranda warnings. We disagree.
 {¶ 12} A witness is a putative defendant if, at the time he appears before the grand jury, the witness is potentially the focus of the investigation and is thus subject to possible indictment.[3] In the context of a grand jury proceeding, after being sworn, but prior to any questioning, the witness must be told that he has a constitutional privilege to refuse to answer any question that might incriminate him.[4] The witness must be warned that any incriminating answers or statements he does make can be used against him in a subsequent prosecution.[5] Finally, the witness must be advised that he may have an attorney outside the grand jury room and may consult with him if he wishes.[6]
 {¶ 13} After receiving testimony at the suppression hearing, the trial court concluded that Huggins was not a putative defendant when he testified before the grand jury. The trial court journalized the following entry: *Page 7 
 "Defendant's motion in limine is overruled. Testimony at hearing (12/16/2005) establishes that defendant was not a suspect and was not in custodial interrogation at the time of his statement to the police. Furthermore, court finds that the Fifth Amendment does not mandate suppression of defendant's testimony before the grand jury as he was not a suspect."[7]
 {¶ 14} An appeal of a trial court's ruling on a motion to suppress evidence involves mixed questions of law and fact. Initially, we note that in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.[8] Thus, the credibility of witnesses during a suppression hearing is a matter for the trial court. A reviewing court should not disturb the trial court's findings on the issue of credibility.[9] Accordingly, in our review we are bound to accept the *Page 8 
trial court's findings of fact when they are supported by competent, credible evidence.[10]
 {¶ 15} Upon reviewing the record, we conclude that the court's findings are supported by competent, credible evidence. Homicide Detective Michael Beaman, testified that the day after the shooting, he identified Ryhan Ikner, and compiled a list of approximately twelve individuals with whom Ikner associated. Detective Beaman discovered that Huggins as well as his brother, Dermayne, were on the list.
 {¶ 16} Detective Beaman testified that several days after the shooting, a young man came to the Homicide Unit to see him. The young man indicated that on the morning of the shooting, he was standing at the bus stop across the street from the check cashing store when he saw Ikner in the company of a male known as "Kiss." The young man also indicated that seconds after he boarded the bus, he heard gunshots. Detective Beaman testified that based on the information the young man provided, he was able to identify "Kiss" as a male named Marcus Gilbert.
 {¶ 17} Detective Beaman testified that he received Crime Stoppers tips that indicated that a male known only as L.A. and a male known as Arnold Shorter were involved in the attempted robbery. Detective Beaman later identified "L.A." as Anthony Garrett. Detective Beaman obtained arrest warrants for the three suspects and took them into custody. *Page 9 
 {¶ 18} Detective Beaman testified that all three suspects denied any involvement in the robbery. Garrett and Shorter claimed to have spent the night before the robbery at Gilbert's home. Gilbert corroborated the claims of Garrett and Shorter.
 {¶ 19} Garrett claimed that Ikner told him that he planned to rob the check cashing store and wanted him to be a lookout. Garrett also stated that Ikner wanted Garrett to call him on his cell phone when he saw the store's owner arrive. Garrett claimed that he agreed to be a lookout, but he did not have his cell phone with him. Detective Beaman testified that the investigation uncovered that several cell calls were made between Garrett, Shorter, and Ikner's cell phone immediately prior to and immediately following the attempted robbery.
 {¶ 20} Detective Beaman testified that on October 8, 2004, another homicide occurred on East 147th Street and Lakeshore Boulevard. The suspect was identified as Dermayne Huggins ("Dermayne"). Once Dermayne was in custody, Detective Beaman interviewed him and discovered that he was Ikner's close friend.
 {¶ 21} Detective Beaman testified that Dermayne provided a written statement in connection with the August 3, 2004, attempted robbery and homicides. In the statement, Dermayne indicated that Ikner and Shorter had spent the night in his home the night before the robbery. Dermayne also indicated that Ikner and Shorter discussed robbing the check cashing store. Finally, Dermayne indicated that after *Page 10 
the robbery, Shorter admitted his involvement and described to Dermayne exactly how the shootings occurred.
 {¶ 22} Detective Beaman testified that he needed to verify Dermayne's statement regarding the whereabouts of Garrett and Shorter, who both claimed to have been at Gilbert's home. Detective Beaman contacted Huggins' mother, Mary Bradford, and arranged to meet with her on October 16, 2004. Detective Beaman testified about the meeting as follows:
 "Q. And at the time that you interviewed these two individuals, are they suspected to be involved in this homicide?
 A. No. I'm looking at them as being witnesses because now I got information that the guys who I have arrested, Arnold Shorter and Marcus — I'm sorry — and Anthony Garrett, are not telling us the complete truth about their involvement in this homicide.
 Q. And were you able to get information from Mary Bradford and the Defendant Akeem Huggins at that time as to the whereabouts of these men?
 A. I did. Miss Bradford verified that when she — that she is — that she knew for sure that Ryhan Ikner and, I believe, Arnold Shorter for sure, spent the night in her home. She was not sure about the kid known as L.A. I don't think she knew much about him. However, when I interviewed Akeem, Akeem told me that when he woke up that morning, his brother's friends was in the room. And he described recognizing Ryhan Ikner, he recognized Arnold Shorter, but there was a third male there who was laying, I believe on the floor but he had some covers over his head and he didn't know who that male was. In my mind I'm thinking this could be Anthony Garrett or the male known as Kiss. This is what we're thinking because these are the guys we have arrested and charged in this matter from other evidence. So at this point we're *Page 11 
 thinking of Mary Bradford and Akeem Huggins as potential witnesses in this matter.
 * * *
 "Q. Okay. Now did there come a point in time after those days in October in which these individuals were then called before the Grand Jury?
 A. That's correct. They were asked to — subpoenaed to testify in the Grand Jury when evidence was being put to the Grand Jury in connection with the arrest of Marcus Gilbert, Arnold Shorter, and Anthony Garrett.
 Q. And if you know, what was the purpose in having them come testify before the Grand Jury?
 A. To show the conflict between what's being reported by Darryl Gilbert, who was sort of trying in a way to provide an alibi for these guys, to show that they were not telling us the truth.
 Q. Okay. So that Mary Bradford and Akeem Huggins were to testify as to the whereabouts of these young men in the early morning hours of the day of the homicide; is that correct?
 A. That's correct.
 * * *
 "Q. Okay. At any time did you view, during those days up to the first of November when the Grand Jury testimony took place did you view Akeem Huggins as a suspect or have any evidence or information to suggest that he was involved in either this plot to commit robbery or present at the time the shooting took place?
 A. None whatsoever. *Page 12 
 A. Yes. As a result of pretrial negotiations with Arnold Shorter, in the presence of his attorney, he gives a written statement and it was at that time — and that was the first time we ever heard that Akeem was present at the robbery.
 Q. And when was that you took the statement from Arnold Shorter.
 A. That would have been April of this year.
 Q. Okay. So six months later; is that correct?
 A. Yeah, yes.
 Q. All right. And did there come a time that you brought charges against Akeem Huggins?
 A. Shortly after that, we took an additional statement from Anthony Garrett in the presence of his attorney, at which time he also indicated that the male he described on the side of the fence, the large light-skinned guy, he knew who he was all the time but he didn't want to tell, and he identified him as Akeem Huggins."[11]
 {¶ 23} A review of the record before us supports the trial court's conclusion that Huggins was a witness and not a suspect at the time Huggins appeared before the grand jury. Detective Beaman testified that when Huggins appeared before the grand jury, the State was seeking indictments against Shorter, Garrett, and Gilbert. Huggins' testimony was necessary to verify the suspects' whereabouts the night prior to the robbery. Huggins' testimony confirmed Dermayne's version of the whereabouts of Shorter and Garrett the night prior to the robbery. Huggins' *Page 13 
testimony thus served to refute the claim of Shorter and Garrett that they had spent the night at Gilbert's house.
 {¶ 24} In addition, the length of time between the shooting and Huggins' indictment supports the conclusion that he was a witness at the time he appeared before the grand jury. The homicides took place on August 3, 2004. Huggins appeared before the grand jury on November 1, 2004, after which the grand jury returned indictments against Shorter, Garrett, and Gilbert. In April 2005, Shorter and Garrett made additional statements to Detective Beaman. Their statements implicated Huggins as the fourth individual involved in the homicides. It was this revelation, which came approximately six months after Huggins' grand jury appearance, that transformed him into a suspect.
 {¶ 25} Nonetheless, Huggins contends that he was a suspect at the time of his appearance before the grand jury because the police were looking for a light-skinned black male, approximately six feet tall, and weighing about 240 pounds, a description he fits. We are not persuaded.
 {¶ 26} Detective Beaman testified that he did not suspect Huggins despite the fact that he was a tall, light-skinned black male who weighed about 240 pounds. Detective Beaman testified in pertinent part as follows:
 "This young man had a job. All indications from his mother and his brother — these were friends of his brother. This young man came to my office on his own free will. He answered my questions, okay? I had *Page 14 
 no reason to think that he was the light skinned male. And believe me, sir, I am sure that there are a lot of tall light skinned, heavy build males in the Lake Shore area."[12]
 {¶ 27} We conclude on the evidence before us that Huggins was not a putative defendant at the time of his appearance before the grand jury and, thus, it is was not necessary to advise him of his Fifth Amendment rights. Further, because Huggins was not the focus of the investigation at the time of his appearance before the grand jury, his testimony was admissible. Consequently, the trial court properly denied the motion to suppress. Accordingly, we overrule Huggins' first and second assigned errors.
 Leading Questions {¶ 28} In the third assigned error, Huggins argues the trial court erred when it allowed the prosecuting attorney to ask leading questions of codefendant Garrett, the State's witness, who had earlier given incriminating testimony against Huggins before the grand jury. We disagree.
 {¶ 29} Evid.R. 611(C) provides as follows:
 "Leading questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."[13] *Page 15 
 {¶ 30} It is wholly within the discretion of the trial court to permit the State to ask leading questions of its own witnesses.[14] As stated in State v. Lewis,[15] "the exception `except as may be necessary to develop his testimony' is quite broad and places the limits upon the use of leading questions on direct examination within the sound judicial discretion of the trial court."
 {¶ 31} In the instant case, the State called Garrett as its first witness. After Garrett was sworn and after answering a few preliminary questions, the following exchange took place:
 "Q. Okay. All right. Now, would you tell us what happened on the date of August 3rd, what happened there?
 A. Huh-uh. I refuse to say.
 Q. Well, you know the way this works is, you don't get to have the choice as to whether or not you're going to answer the questions; do you understand that?
 A. I don't have a choice?
 Q. No, sir.
 A. Why don't I?
 Q. Well, the terms of the plea agreement that you plead guilty require you to testify; you understand that, don't you?
 A. Yes, I understand that. *Page 16 
 Q. What happened?
 A. I refuse to answer.
 Q. All right. Well, do you understand that if you refuse to answer, your time's gonna stand still?
 A. Yes.
 Q. All right. If the Judge directs you to answer the questions, is it your intention not to answer anything.
 A. Yes.
 Q. Well, you did testify before the grand jury; didn't you?
 A. Yes.
 Q. Right. You did appear before Judge Mannen and say you were involved in this robbery; didn't you?
 A. Yes.
 Q. All right. When you were in front of the grand jury, you told them that Akeem Huggins was involved in this; didn't you?
 Mr. Reed: Objection.
 The Court: Let me see counsel at sidebar."[16]
 {¶ 32} The record reveals that after Huggins' counsel raised the objection, significant discussions took place regarding the efficacy of Garrett's exercising his *Page 17 
Fifth Amendment privilege. The State argued that it should be allowed to read Garrett's grand jury testimony verbatim to the jury, which Huggins opposed. After extensive briefing by both sides, the trial court allowed Garrett to exercise his Fifth Amendment right not to testify further. The trial court then advised the jury as follows:
 "At the beginning of the trial, you heard brief testimony from one of the alleged — one of the people alleged to be a member involved in this incident, Mr. Garrett. As you'll recall, after a few questions, he declined to answer any further questions. As we determined this afternoon, he refused to answer questions based upon his assertion of a constitutional right not to testify — not to offer testimony; that was his right and, of course, his guilt or innocence is not before you so you will not have that to consider. I do want to emphasize that you may not draw any conclusions from his refusal to testify as to the guilt or innocence of the Defendant in this case, Mr. Huggins. The answers that you have to the questions that were asked you may consider for what they are worth, but you should not draw any conclusions as to anything else that he might have said or questions that were asked and not answered as to the guilt or innocence of Mr. Huggins."[17]
 {¶ 33} There is nothing in the record to suggest that the trial court overstepped its broad discretion in allowing the State to ask leading questions of Garrett. Huggins' trial counsel immediately objected after the question regarding Garrett's previous testimony before the grand jury. Thereafter, the trial court allowed Garrett to exercise his Fifth Amendment right not to testify any further. *Page 18 
 {¶ 34} In addition, the trial court safeguarded Huggins' right to a fair trial by instructing the jury not to draw any conclusion as to Huggins' guilt or innocence based upon Garrett's refusal to answer the questions posed to him. We conclude, given the circumstances as they unfolded at trial, Huggins was not prejudiced by the leading question, which went unanswered, about Garrett's previous grand jury testimony. Accordingly, we overrule Huggins' third assigned error.
 Photo Array {¶ 35} In the fourth assigned error, Huggins argues the trial court erred when it allowed the State to utilize a chalkboard to display the photographs of Ikner, Shorter, Garrett, and Huggins. We disagree.
 {¶ 36} In the State's opening statement, the prosecutor stated "You have the four photographs in front of you. And I give you these photographs so that you can understand the opening statement and follow the testimony as it's presented."[18]
 {¶ 37} In State v. Breedlove,[19] the Supreme Court of Ohio established that:
 "On direct examination, evidence of the identification of the defendant from a selection of photographs, using photographs from police files with police identification numerals thereon which provide the finder of facts with the reasonable inference that defendant has had prior criminal involvement, may not be used for the purpose of proving defendant's identity."[20] *Page 19 
 {¶ 38} However, police identification photographs which do not infer that the defendant has a prior criminal record may be admitted into evidence in order to demonstrate the witness's description of the appellant.[21] Our review of the record does not indicate that the photographs that were placed on the chalkboard provided a basis for a reasonable inference that Huggins had a prior criminal record.
 {¶ 39} We conclude that the photographs were used for the permissible purpose of aiding the jurors in understanding opening statement and following the testimony as the trial progressed. Consequently, the trial court did not err in allowing the State to display the photographs on the chalkboard. Accordingly, we overrule Huggins' fourth assigned error.
 Closing Argument {¶ 40} In the fifth assigned error, Huggins argues that the trial court erred in allowing the prosecutor, during closing argument, to vouch for the credibility of a State's witness. We disagree.
 {¶ 41} Huggins contends that the prosecutor vouched for the credibility of Cleveland City Councilman Michael Polensek. However, our review of the record indicates that during closing argument the prosecutor stated in pertinent part as follows: *Page 20 
 "This past week you heard from a number of witnesses that we brought before you. And you heard about this senseless act of violence that occurred as a result of a number of these individuals, including the defendant himself, who acted together and caused the death of a person who you heard from Councilman Polensek was a very well-respected person in the community. He did a lot for the community and this was a senseless act of violence. As a result of their actions, acting together, you heard about his death and you also heard about the death of their friend, Ryhan Ikner, who also participated in this murder."[22]
 {¶ 42} Here, the prosecutor's remark reveals that Councilman Polensek stated that William Singleton, the proprietor of the check cashing store, was a well-respected person in the community. As such, we see no prosecutorial misconduct in the statement at issue. Accordingly, we overrule Huggins' fifth assigned error.
 Consecutive Sentence {¶ 43} In the sixth assigned error, Huggins argues the trial court erred when it imposed a consecutive sentence after making judicial findings. We agree, based on the Ohio Supreme Court's recent decision inState v. Foster[23]
 {¶ 44} In Foster, the Supreme Court held that several provisions of S.B. 2, including R.C. 2929.14(E), which governs the imposition of consecutive sentences, violate Blakely. Specifically as it pertains to R.C. 2929.14(E), the Court held: "because the total punishment increases through consecutive sentences only after *Page 21 
judicial findings beyond those determined by a jury or stipulated to by a defendant, R.C. 2929.14(E)(4) violates principles announced inBlakely."[24] The Court severed R.C. 2929.14(E) from the sentencing statutes based on its finding that Blakely rendered it unconstitutional.
 {¶ 45} As a result, the trial court is no longer obligated to give reasons or findings prior to imposing a consecutive sentence. The Court held that:
 "[Cases] pending on direct review must be remanded to trial courts for new sentencing hearings not inconsistent with this opinion.
 * * *
 "Under R.C. 2929.19 as it stands without (B)(2), the defendants are entitled to a new sentencing hearing although the parties may stipulate to the sentencing court acting on the record before it. Courts shall consider those portions of the sentencing code that are unaffected by today's decision and impose any sentence within the appropriate felony range. If an offender is sentenced to multiple prison terms, the court is not barred from requiring those terms to be served consecutively. While the defendants may argue for reductions in their sentences, nothing prevents the state from seeking greater penalties. United States v. DiFrancesco (1980), 449 U.S. 117, 134-136, 101 S.Ct. 426, 66 L.Ed.2d. 328."[25] *Page 22 
 {¶ 46} Thus, in accordance with Foster, we vacate Huggins' sentence and remand for resentencing. In doing so, we note the Ohio Supreme Court's clarification in State v. Mathis:[26]
 "Although after Foster, the trial court is no longer compelled to make findings and give reasons at the sentencing hearing since R.C. 2929.19(B)(2) has been excised, nevertheless, in exercising its discretion the court must carefully consider the statutes that apply to every felony case. Those include R.C. 2929.11, which specifies the purpose of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of the offender. In addition, the sentencing court must be guided by statutes that are specific to the case itself."[27]
 {¶ 47} Accordingly, we sustain Huggins' sixth assigned error.
 {¶ 48} This matter is affirmed as to Huggins' conviction; sentence vacated and case remanded for resentencing.
It is ordered that appellee and appellant share the costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate be sent to said court to carry this judgment into execution. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 23 
 COLLEEN CONWAY COONEY, P.J., and MARY J. BOYLE, J., CONCUR *Page 24 
 APPENDIX Assignments of Error "I. The trial court erred to the substantial prejudice of theappellant when it permitted the prosecuting attorney to read the entiregrand jury testimony of the appellant in the presence of the jury. Theappellant appeared at the grand jury pursuant to subpoena issued by theprosecutor, prior to his own indictment for two counts of murder,robbery, obstruction, where he was not Mirandized nor warned of thegrave danger he was in prior to his grand jury testimony."
"II. The trial court erred to the substantial prejudice of theappellant and by overruling the appellant's motion to suppressevidence."
"III. The trial court erred to the substantial prejudice of theappellant when it permitted the prosecuting attorney to ask leadingquestions, specifically, `when you testified before the grand jury, youstated Huggins was involved in this case,' of a co-defendant, whoearlier testified before the grand jury, incriminating appellant, butinvoked the Fifth Amendment at trial. The jury had been informed thatthe co-defendant had pled guilty and was serving fifteen years inprison."
"IV. The trial court erred to the substantial prejudice of theappellant when it permitted a photo array of the co-defendants to beplaced on the chalk board along with appellant's picture during openingstatement when separate trials had been ordered and the co-defendantshad pled guilty to manslaughter, and robbery said action deceived thejury into thinking the appellant was a member of a gang which was knownfor violent tendencies and drug dealing."
"V. The trial court committed reversible error by permitting theprosecutor to vouch for the credibility of the State's witness, CityCouncilman Michael Polensak, who testified about unrelated other badacts of violence in the community, when said witness had no personalknowledge of the facts in the case."
"VI. The trial court committed reversible error when it sentencedappellant to consecutive terms."
[1] Appendix.
[2] 109 Ohio St.3d 1, 2006-Ohio-856.
[3] State v. Cook (1983), 11 Ohio App.3d 237.
[4] Id.
[5] Id.
[6] See United States v. George (1971), 444 F.2d 310, 315.
[7] Journal Entry, January 11, 2006.
[8] See State v. Robinson (1994), 98 Ohio App.3d 560; State v.Rossiter (1993), 88 Ohio App.3d 162; State v. Lewis (1992),78 Ohio App.3d 518; State v. Warren (Aug. 12, 1991), 4th Dist. No. 90CA7.
[9] See State v. Mills (1992), 62 Ohio St.3d 357; State v.Fanning (1982), 1 Ohio St.3d 19.
[10] See State v. Harris (1994), 98 Ohio App.3d 543.
[11] Tr. at 22-26.
[12] Tr. at 32.
[13] State v. Johnson, Cuyahoga App. No. 82340, 2003-Ohio-6634.
[14] State v. Miller (1988), 44 Ohio App.3d 42, 45.
[15] (1982), 4 Ohio App.3d 275, 278.
[16] Tr. at 365-366.
[17] Tr. at 997.
[18] Tr. at 344.
[19] (1971), 26 Ohio St.178.
[20] Id.
[21] State v. Pilgrim (March 3, 1988), Cuyahoga App. No. 53513. See also State v. Ember (January 17, 1980), Cuyahoga App. No. 40196.
[22] Tr. at 1090.
[23] 109 Ohio St.3d 1, 2006-Ohio-856.
[24] Id. at ¶ 67.
[25] Id. at ¶ 104-105.
[26] 109 Ohio St.3d 54, 2006-Ohio-855.
[27] Id. at ¶ 38. *Page 1